UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MICHIGAN SOUTH CENTRAL
POWER AGENCY, *a public body politic
and corporate of the State of Michigan*,

        Plaintiff,

                                        CASE NO. 5:06-CV-70

v.

                                        HON. ROBERT HOLMES BELL

CONSTELLATION ENERGY
COMMODITIES GROUP, INC.,
*a Delaware corporation formerly
known as* Constellation Power Source, Inc.,

        Defendant.
_____/

## OPINION

    Plaintiff Michigan South Central Power Agency ("MSCPA") sues Defendant Constellation Energy Commodities Group, Inc. ("CCG") f/k/a Constellation Power Source, Inc., alleging two breaches of contract: (1) failure to indemnify MSCPA for certain charges, and (2) failure to make physical delivery free and clear of all charges incurred prior to delivery. CCG has filed a motion to dismiss the complaint for lack of jurisdiction (Docket #3), on the grounds that MSCPA's contract claims are preempted by the Federal Power Act ("FPA"), 16 U.S.C. §§ 791 *et seq.*, because they will encroach on the rate-setting responsibilities of the Federal Energy Regulatory Commission ("FERC") to enforce the FPA. For the reasons that follow, the Court grants in part and denies in part the motion to dismiss.

## I.

According to the allegations of the complaint, MSCPA is a public corporation providing power to its five member municipalities: the cities of Coldwater, Hillsdale and Marshall, and the villages of Clinton and Union City, which each own and operate a municipal electric utility serving retail electric customers. Since 1982, MSCPA has owned and operated a coal-fired electric generating plant in Litchfield, Michigan. In connection with the plant's construction, MSCPA purchased an undivided ownership in certain transmission facilities of Consumers Power Company, together with rights entitling MSCPA to transmit up to 90 megawatts ("MW") of power over the Consumers' system. The contract governing that agreement is the Project 1 Transmission Ownership and Operating Agreement between MSCPA and Consumers (the "O&O Agreement"). In 2002, the O&O Agreement was assigned to the Michigan Electric Transmission Company ("METC") as part of a sale of Consumers' transmission system. In February 2006, MSCPA purchased an additional 31.5 MW of transmission ownership and use rights over the system.

MSCPA has agreed to provide all of the bulk power needs of the member municipalities. MSCPA also purchases power from other sources through third-party contracts such as the Power Purchase and Sale Agreement ("Master Agreement") in issue in this case between MSCPA and CCG.

MSCPA is also a member transmission owner in the Midwest Independent Transmission System Operator, Inc. ("MISO"), which is a FERC-approved Regional Transmission Organization ("RTO"). RTOs are independent entities authorized by FERC

2

to provide nondiscriminatory transmission service over large segments of the country. MISO's service territory includes all or part of 15 states within the Midwest and Canada, including the entire area in which MSCPA operates. MISO maintains functional control of certain transmission facilities including those of MSCPA and METC, in order to assure reliable and uninterrupted transmission of electric. As part of that responsibility, MISO controls the administration of the open access transmission tariff that sets the rates, terms and conditions of transmission service offered by MISO and the energy markets administered by MISO. MSCPA delivers electric to its members within the MISO territory through points of interconnection with the transmission system of METC. MSCPA's ownership and use rights under the O&O Agreement are governed by the MISO operating protocols. Energy is delivered to MSCPA members through the METC transmission system, with the Village of Clinton also receiving power through a separate agreement with DTE.

On December 12, 2001, MSCPA entered into a Master Agreement to purchase 30 MW of power from CMS Marketing, Services and Trading Company ("CMS"). (Compl. Ex. A.) By an "Assignment Agreement" dated February 14, 2003, Defendant CCG "assume[d] all of CMS' rights, duties and obligations under the Transactions and the Master Agreement." (Compl. Ex. C.) The Master Agreement provided that the parties could enter into transactions for the purchase and sale of electric power by way of separate "Transaction Confirmation Agreements" or "Transaction Confirmations."

Contemporaneously with the signing of the Master Agreement, MSCPA and CMS agreed in a Transaction Confirmation to purchase 30 MW of electric for a seven (7)-year

3

period commencing January 1, 2002 and concluding December 31, 2008. (Compl. Ex. B.) The Transaction Confirmation set specific and fixed bundled prices for purchases and sales of electric power. The Transaction Confirmation and Master Agreement is a "seller's choice" agreement, under which the seller selects the source of power and is responsible for shipping that power to the designated Delivery Point, which the Confirmation defines as "into Consumers," which now means "into METC." Under the Master Agreement, title passes at the Delivery Point, and the "Seller warrants that it will deliver to Buyer Power free and clear of all liens, claims and encumbrances arising prior to the Delivery Point(s)." (Compl. Ex. A, ¶ 8.1.) The agreement also states that

> Seller shall be responsible for any transmission losses and loss charges relating to the transmission of Power to the Delivery Point(s). Buyer shall be responsible for any transmission losses and loss charges relating to the transmission of Power from the delivery Point(s).

(Compl. Ex. A., ¶ 3.1.) Further, the Master Agreement contains an indemnification clause:

> To the extent permitted by law, as between the Parties hereto, each party *shall be responsible for and shall indemnify, defend and hold the other harmless with respect to any losses, injuries, claims, liabilities or damages on the indemnifying Party's side of the Delivery Point*, unless caused by the negligence or willful misconduct of the other Party.

(Compl. Ex. A, ¶ 8.1 (emphasis added).) Paragraph 12.16 of the Master Agreement also provides that

> In the event a Transaction becomes regulated by a federal, state or local regulatory body, and such body shall disallow all or any portion of any costs incurred or yet to be incurred by either party under any provision of this Agreement, *such action shall not operate to excuse either party from performance of any obligation . . . .*

4

(Compl. Ex. A, ¶ 12.16 (emphasis added).)  Finally, in the Assignment Agreement, CCG agreed that it would hold MSCPA harmless from all costs incurred "in connection with" the delivery of electric power to the Delivery Point identified in the Master Agreement and Transaction Confirmation:

> Constellation shall hold [MSCPA] harmless from *any and all costs (including but not limited to* costs associated with *transmission, congestion management or otherwise) incurred by Constellation or [MSCPA] in connection with Constellation's delivery of Power to the Delivery Point*, as set forth in the Master Agreement and Transactions.

(Compl. Ex. C, ¶ 5 (emphasis added).)

After execution of the Agreements, FERC acted to eliminate certain transmission charges that previously were assessed in connection with electric power transactions that crossed the border between different RTOs, in this case, between MISO and PJM Interconnection, LLC ("PJM"), which covers the mid-Atlantic region.  Specifically, FERC eliminated "rate pancaking," which occurred when electric power transmissions crossed multiple electric transmission systems and were assessed multiple "regional out and through rates" ("ROTRs").  Before they were eliminated, these ROTRs were paid by CCG or its upstream suppliers.  In order to provide temporary replacement for lost revenues from the eliminated charges, FERC assessed, for the period from December 1, 2004 through March 31, 2006, a Seams Elimination Cost Adjustment ("SECA").  The transitional SECA charge was a "load-based"charge placed on all load-serving entities ("LSEs"), including MSCPA, to approximate the revenues formerly received from the RTORs.  The rate was based on transactions that occurred in 2002 and 2003, so an entity could not avoid the charge

by ceasing to engage in cross-RTO transactions.  Although the rule imposed SECA costs on LSEs, FERC provided a mechanism for LSEs to demonstrate that the SECA charges should be passed along to a supplier/seller such as CCG.

Thereafter, MSCPA petitioned FERC to shift its SECA costs to CCG.  In its FERC pleadings, MSCPA raised essentially the same arguments about the contract provisions that it now raises in its complaint and its brief.  In addition, in the hearing before the Administrative Law Judge ("ALJ"), MSCPA provided significant testimony on the question of CCG's obligation to pay the SECA charges, and it cross-examined CCG witnesses.  The ALJ issued his initial decision, accepting MSCPA's arguments in substantial measure and concluding that the majority of SECA charges should be shifted to CCG.  (Def. Reply Br., Ex. 2 at 125-28.)  MSCPA seeks to recover under the indemnification provisions of its agreements the remaining SECA charges not shifted by the FERC.

In addition to the SECA costs imposed by FERC, in Count II of the complaint, MSCPA seeks to hold CCG liable for certain charges imposed upon MSCPA by MISO.  On April 1, 2005, well after adoption of the Master Agreement, MISO created the Day 2 energy market, which is composed of (a) a Day-Ahead Market, and (b) a Real-Time Market.  Under MISO rules, in the Day-Ahead Market, a buyer of energy must inform MISO the day ahead of need what its expected energy demands are and from what source it will be receiving that energy.  The information enables MISO to accept necessary bids from suppliers, match those bids to bids from purchasers, and manage congestion by directing traffic under its transmission grid.  The Real-Time Market, in contrast, operates as a market clearing

mechanism, by which MISO reconciles, at real-time prices, any differences between the amount of electric power that was contracted for in the Day-Ahead Market and the amount that actually was withdrawn from the market by each buyer or injected into the market by each generator or seller.

Contracts entered into prior to September 15, 1998 are considered by MISO as "Grandfathered Agreements" or "GFAs."  Under decisions issued by FERC, certain GFAs are not required to follow all Day 2 energy market protocols, but instead are entitled to "carved-out" treatment.  Carved-out GFAs are exempt from congestion management charges and loss charges.  Congestion management charges are assessed by MISO based on the levels of demand and use of transmission lines.  Loss charges are assessed by MISO based on the amount of power lost during transmission (*i.e.,* the difference between the amount of power to be delivered and that actually delivered, as a result of normal losses of power that occur during transmission).  In order to receive carved-out treatment, GFA customers like MSCPA must submit schedules of physical delivery to MISO in the Day-Ahead Market, identifying, among other things, the source of the power being scheduled.

Since implementation of the Day 2 market, FERC has allowed both physical and financial deliveries of power.  A financial bilateral transaction does not involve the physical delivery of power, but is an agreement for the financial transfer of energy between commercial pricing node source and sink points. A physical bilateral transaction is an agreement for the physical flow of energy between commercial pricing node source and sink points.

7

According to MSCPA, the Master Agreement with CCG requires CCG to make physical deliveries of power.  CCG does not appear to contest the issue.[1]  Notwithstanding this requirement under the Master Agreement, CCG began to make financial rather than physical transfers of energy.

MSCPA alleges that, because CCG is not fulfilling its contractual obligation to make physical deliveries of power, MSCPA is unable to submit the necessary schedules to MISO that will allow it to be treated as a carved-out GFA.  While MSCPA can tell MISO a day ahead what its demand will be, because it is under a seller's choice agreement with CCG, MSCPA is unable to tell MISO the expected source of its power without CCG's cooperation, which CCG allegedly refuses to give.  According to Plaintiff, the reason CCG cannot provide

---

[1]The Assignment Agreement provides, in relevant part, as follows:

> The outstanding transactions CMS currently has with [MSCPA] for the purchase of physical capacity and energy specified [in the Transaction Confirmation and Master Agreement] . . . are among the contracts CMS has agreed to sell to [CCG].
>
> . . .
>
> 3.     [CCG] agrees to assume all of CMS' rights, duties and obligations under the Transactions and the Master Agreement on the Effective Date.

(Compl. Ex. C, Assignment Agreement.)  Section 4.1 of the Master Agreement provides:

> 4.1 Delivery Point(s).  Seller shall deliver Power to Buyer and Buyer shall receive Power from Seller at the Delivery Point(s) as identified in the relevant Transaction Confirmation.

(Compl. Ex. A, Master Agreement.)  Section 1.11 of the Master Agreement states that "'*Power*' means electric capacity and/or energy." *Id.*

8

MSCPA with information on the expected source of power is that CCG has ceased making physical delivery of power, as required by the contract, and instead has decided to meet its obligation by making financial transfers of energy.  Because no physical energy is being delivered to a particular node, CCG cannot inform MSCPA of the source or amount of power to be delivered.  MSCPA, in turn, cannot provide the information to MISO.  MISO, therefore, while recognizing MSCPA's O&O as a carved-out GFA, still charges MSCPA as if it does not have a GFA, requiring it to pay the congestion management charges and loss charges from which its GFA status otherwise should make it exempt.  MSCPA seeks to recover the congestion and loss charges it has been forced to pay and that, it argues, CCG should pay under its agreement to make physical delivery and its additional indemnification agreement to pay all costs up to the point of physical delivery of the electric.

## II.

Defendant CCG argues that the Court is without jurisdiction to decide the complaint as MSCPA's claims are preempted under three theories: (1) complete or field preemption; (2) conflict preemption; and (3) the filed-rate doctrine.

The FPA grants FERC "exclusive authority to regulate the transmission and sale of electric energy in interstate commerce." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982).  FERC is obligated to ensure that transmission and wholesale power rates are "just and reasonable" and are applied in a non-discriminatory manner.  16 U.S.C. § 824d(a), (d).  States are not permitted to regulate in areas where FERC has exercised its jurisdiction to determine just and reasonable rates.  *See Mississippi Power & Light Co. v.*

9

*Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988).  "The right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable rate."  *Montana-Dakota Util. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951).  "'Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction . . . . This was done in the Power Act by making [FERC] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States.'"  *Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 966 (1968) (quoting *Fed. Power Comm'n  v. S. Cal. Edison Co.*, 376 U.S. 205, 215-16 (1964)); *Pub. Util. Dist. No. 1 of Grays Harbor County v. Idacorp. Inc. ("Grays Harbor")*, 379 F.3d 641, 646-47 (9th Cir. 2004).

A.    Field Preemption

Field preemption occurs when federal law is sufficiently comprehensive to require a court to infer that Congress left no room for additional regulation by the states.  *Grays Harbor*, 379 F.3d at 647.  "When the federal government completely occupies a field or an identifiable portion of it . . . the test of preemption is whether 'the matter on which the state asserts the right to act is in any way regulated by the federal government.'" *Pacific Gas and Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n*, 461 U.S. 190, 212-13 (1983) (quoting *Rice v. Santa Fe Elev. Corp.*, 331 U.S. 218, 236 (1947)).

### 1.    SECA charges

Defendant argues that the SECA charges in issue constitute action taken by FERC in its exclusive authority to set rates, eliminating ROTRs and imposing SECA charges. It therefore contends that a state-law contract claim about the responsibility for those charges is preempted because the federal government has completely occupied that portion of the field affecting ratesetting. Plaintiff, in contrast, argues that its claim is unrelated to the FERC's decision to eliminate ROTRs and temporarily impose SECA charges on LSEs. It further argues that it does not dispute the amount of SECA charges determined by FERC. It asserts that FERC rates and the amount of the SECA charge shifted to CCG by the ALJ was based solely on FERC law, which MSCPA also does not dispute. Instead, it asserts, its claim is strictly contractual, resting solely on the independent contractual obligation of CCG to indemnify MSCPA for costs related to the transmission of power to the delivery point. It contends, therefore, that the state-law contract claim is independent of the FERC determination and is not preempted.

Courts have on numerous occasions held that the authority granted to FERC over interstate transmission and wholesale sales of electricity is exclusive and completely preempts state authority. *See Arkansas Louisiana Gas Co. v. Hull*, 453 U.S. 571, 580 (1981) (finding state breach-of-contract claim is preempted because Commission had exclusive jurisdiction and state court's interpretation of terms could interfere with FERC rates); *Nantahala Power*, 476 U.S. at 966 (FERC power to set rates is exclusive). Courts also have recognized that state-law contract claims may, in fact, be preempted by the FPA because they

11

conflict with FERC's exclusive jurisdiction.  *See, e.g., Arkansas Louisiana Gas*, 453 U.S. at 580 ("[T]he mere fact that respondents brought th[eir] suit under state law [does] not rescue it, for when [C]ongress has established an exclusive form of regulation, there can be no divided authority over interstate commerce.  Congress here has granted exclusive authority over rate regulation to the Commission."); *Grays Harbor*, 379 F.3d at 648 (it is the thrust of the complaint, not the form of the action, that governs preemption).

Here, the FERC has determined that SECA rates should be paid by LSEs based on their load.  It also has provided a specific mechanism for shifting the SECA charge to the shipper for certain pre-existing contracts.  FERC therefore has determined both that a load-based charge is fair and reasonable and that LSEs should be able to shift those charges only under certain circumstances.  It therefore has squarely occupied the field for determining which entity should pay particular SECA charges.  MSCPA's indemnification claim would require this Court to determine whether the SECA charges were related to the delivery of power and the reasonableness of shifting those charges to CCG.  "At the very least, the requested relief intrudes on an 'identifiable portion' of a field that the federal government has occupied and addresses a matter that is 'in any way regulated by the federal government.'" *Grays Harbor*, 379 F.3d at 648 (quoting *Pac. Gas & Elec.,* 461 U.S. at 212-13).

In asserting that FERC's jurisdiction over the issue in question is not part of its exclusive jurisdiction, MSCPA cites numerous FERC decisions in which the agency has declined to exercise its primary jurisdiction to interpret contract disputes that do not truly go to the rate-setting authority of FERC and fall outside its exclusive jurisdiction.  (*See* Pl. Br.

in Opp. to Def. Mot. to Dismiss, Index of Certain Authorities and attached cases; Docket ##15-1 to 15-31).  For example, MSCPA cites *Kentucky Utilities Co.*, 109 FERC ¶ 61,033 (2004), *reh'g denied* 110 FERC ¶ 61,285 (2005) (Docket #15-14).  In *Kentucky Utilities*, FERC declined to assert primary jurisdiction over the interpretation of particular contract language governing the appropriate compensation for backup energy services.  FERC applied the three-part test originally adopted in *Arkansas Louisiana Gas Co. v. Hall ("Arkla")*, 7 FERC ¶ 61,175 at 61,332, *reh'g denied*, 8 FERC ¶ 61,031 (1979), for deciding whether to assert primary jurisdiction over energy contracts:  (1) whether the Commission possesses some special expertise which makes the case peculiarly appropriate for Commission decision; (2) whether there is a need for uniformity of interpretation of the type of question raised by the dispute; and (3) whether the case is important in relation to the regulatory responsibilities of the Commission.  *Kentucky Utilities* involved pure contract questions, upon which the FERC had not taken a policy position and for which there was no need for uniform interpretation.  *See Kentucky Utilities*, 109 FERC at 61,130 ("There is also no need for uniform interpretation of the contract language at issue here.  This is merely a contract dispute between two parties over the appropriate compensation for backup energy services.  Finally, while this is a matter of significance to the parties, it is not important in relation to the regulatory responsibilities of the Commission.").

MSCPA correctly notes that, in *Kentucky Utilities*, FERC rejected the argument that the contract dispute in issue was subject to its exclusive jurisdiction on the grounds that the issue affected rates under a contract on file with FERC.  Unlike the instant case, however,

the contract issue in *Kentucky Utilities* did not involve a situation in which FERC itself had acted to declare which party, as a matter of policy, should bear a particular replacement charge, nor did it provide a method for shifting that charge. The distinction is essential to a determination whether FERC has exercised its jurisdiction in a manner that occupies the field, creating exclusive jurisdiction.

In *Water and Power Dep't of the City of Glendale v. Portland Gen'l Elec. Co.*, 113 FERC ¶ 61,285 (2005), FERC held that a contract dispute about how a rate should be calculated under the terms of the agreement was not a dispute about the proper rate and therefore was not subject to FERC's exclusive jurisdiction. MSCPA argues that, as in *Portland General Electric,* it is not disputing the proper SECA rate or that LSEs generally should pay SECA charges, it only is enforcing a contractual provision requiring CCG to indemnify it. MSCPA's argument, however, fails to appreciate that, in the instant case, FERC has acted not only to set a rate, but also has determined which party, as a matter of policy, should pay a particular charge and has provided a mechanism to determine whether the charges should be shifted. By so doing, unlike in *Portland General Electric*, FERC has so occupied the field of SECA rate payments to preempt state action that may run contrary. *Compare Doswell Ltd. Partnership v. Virginia Elec. and Power Co.*, ¶ 61,196, at 61,730-31 (1992), *reh'g den.* 62 FERC ¶ 61,149 (1993) (claim involving calculation of a rate set by contract "does not really concern issues 'central to the Commission's exercise of responsibilities under the FPA'").

14

These cases, like the other FERC decisions submitted by Plaintiff, do not involve the sort of comprehensive determination by FERC to eliminate certain existing charges and impose other compensatory and temporary charges, to assign responsibility for the payment of such charges to a particular party, and to provide a mechanism to assess the fairness and reasonableness of shifting that responsibility in particular cases.   They therefore are inapplicable to the question before this Court.   For these reasons, the Court finds the cases identified by Plaintiff in its Index of Certain Authorities (Docket #15-1) are inapplicable.

In its supplemental brief, MSCPA cites *United States v. S. California Edison Co.*, 300 F. Supp. 2d 964 (E.D. Cal. 2004), in which the district court found that an indemnification provision in an energy contract was not preempted by the FPA.   MSCPA contends that the case supports the proposition that interpretation of indemnification provisions are not subject to the exclusive jurisdiction of FERC.   The decision in *Southern California Edison*, however, is inapposite to the issue before this Court.   In that case, the court considered only whether the licensing requirements of the FPA barred state-law damages claims for negligence, trespass, breach of contract and breach of license, triggering an indemnification clause in a contract.   The court found that FERC licensees were required by their license to conduct themselves in accordance with both the terms of the license and the laws of the state in which the licensee operates.   *Id.* at 985-86.   The court rejected an assertion that FERC's licensing authority barred any state action to enforce license requirements:

> "It is thus clear enough that while Congress intended that the Commission would have exclusive authority to issue all licenses, it wanted the individual Secretaries to continue to play the major role in determining what conditions

15

would be included in the license in order to protect the resources under their respective jurisdictions." While Congress did not specifically declare that the respective Secretaries would also have authority to enforce such conditions through adjudication or otherwise, the legislative history surrounding the creation of § 797, *et seq.*, makes any other interpretation inapposite.

*Id.* at 983 (quoting *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772 (1984)). *See also Attorney General v. Consumers Power Co.*, 508 N.W.2d 901, 903 (Mich. Ct. App. 1993) (finding state civil action for damages not preempted by FPA licensing requirement); *South Carolina Pub. Serv. Auth. v. FERC*, 850 F.2d 788 (D.C. Cir. 1988) (holding that Congress did not grant FERC the authority to encroach upon state tort law and liability of licensees for damages caused by their projects is matter left to state law).

Here, in contrast, the issue involves the scope of FERC's rate-setting authority, not its licensing authority. Where FERC has determined the fair and reasonable rate of SECA charges and which party should bear responsibility for the charge as a matter of policy, and where the agency has determined a mechanism for shifting charges for certain preexisting contracts, enforcement of a state-law indemnification provision unquestionably would interfere with FERC rate-setting authority.

For all the stated reasons, Plaintiff's state-law claims to recover SECA charges are preempted because federal law occupies the relevant portion of the field.

### 2.    congestion and loss charges

Defendant argues that Plaintiff's breach of contract claims for recovery of congestion and loss charges are also preempted because federal law occupies the entire field.

16

Defendant's brief, however, contains very little argument about the congestion and loss charges imposed by MISO.

The MISO congestion and loss charges in issue unquestionably form part of the rate approved by FERC under the MISO Tariff.  However, it is not at all clear that FERC has occupied the entire field in this area by exclusively monitoring and enforcing each exemption under that tariff as to who should pay any congestion and loss charges imposed upon entities with GFAs.

It is undisputed that the agreement between MSCPA and CCG is a GFA eligible for carved-out treatment from the MISO rules.  It further appears undisputed that, if MSCPA could provide the required schedules of physical delivery to MISO in the Day-Ahead Market and could identify the source of the power being scheduled, it would be exempt from congestion and loss charges.  According to MSCPA's allegations, if CCG were fulfilling its contractual obligation to make physical delivery of power rather than making financial deliveries, CCG and MSCPA would be able to provide those schedules to MISO, eliminating the congestion and loss charges now being imposed.  The regulations in issue, which expressly create carved-out GFAs and permit MSCPA to exercise its right to carved-out treatment, do not appear in any way to have occupied the entire field of contractual obligations governing whether power actually is physically delivered.

In arguing that Plaintiff's contract claim for physical delivery should be preempted, Defendant attempts to conflate the nature of Plaintiff's claim on this issue with Plaintiff's claim for SECA charges.  It argues that Plaintiff asks the Court to make a determination that

17

the congestion and loss charges are "transmission" or "delivery" based and therefore required to be paid by CCG.  Because FERC has determined that such charges are load-based, Defendant argues, Plaintiff's indemnification claim would undermine the FERC authority to set rates.

Defendant's preemption argument is wholly inapplicable to Plaintiff's claim that CCG is violating its obligation to make physical deliveries of power.  Contrary to Defendant's blanket statement, in evaluating that breach of contract claim, the Court will not be required to make any determination about whether congestion and loss charges are related to transmission or delivery.  The contractual obligation to deliver physical power is well outside the area of FERC regulation concerning the exemption of carved-out GFA's from the MISO congestion and loss charges.

With respect to Plaintiff's attempt to enforce the indemnification provision, Defendant makes no attempt to separately analyze Plaintiff's claim independent of its argument concerning SECA charges.  Defendant notes, however, that the requirement that MSCPA provide MISO with scheduling information is the subject of ongoing administrative action. *See Midwest Indep. Transmission Sys. Operator, Inc.*, 112 FERC ¶ 61,311, P 40 (Sept. 19, 2005) ("*Second GFA Rehearing Order*"), Mot. to Dismiss, Ex. 26 (Docket #7) (directing MISO to work with MSCPA to address scheduling requirements that are admittedly impossible for MSCPA to meet).  Defendant suggests that, because that administrative action may relieve MSCPA of the scheduling requirement and thereby eliminate the reason

18

congestion and loss charges are imposed, FERC has occupied the field, preempting Plaintiff's state-law contract claim.

Upon review of the history of the MISO energy market regulations, the Court concludes that the history of FERC's exercise of jurisdiction in the area of congestion and loss charges is narrower than in the area of SECA charges.[2]  In determining that carved-out GFAs are exempt from congestion and loss charges, FERC balanced the fairness and reasonableness of imposing those charges upon certain MISO members with GFAs against the overall reliability and efficiency of the MISO energy markets and against the costs borne by other MISO members.  *See GFA Rehearing Order*, 111 FERC ¶ 61,042, P 95 (April 15, 2005).  Unlike with the SECA charges, FERC has not acted to determine as a matter of policy who, as between parties to a power contract, should pay certain transitional charges necessitated by FERC's elimination of another charge.  It also has not acted to expressly establish a mechanism for shifting those charges between contractual parties.  It therefore does not appear that federal law has occupied the entire field related to liability for congestion and loss charges.

---

[2]*See Midwest Indep. Transmission Sys. Operator, Inc.*, 107 FERC ¶ 61,191 (May 26, 2004) ("*Procedural Order*"), Mot. to Dismiss Ex. 19 (Docket #6); *Midwest Indep. Transmission Sys. Operator, Inc.*, 108 FERC ¶ 61,163 (Aug. 6, 2004) ("*TEMT Order*"), Mot. to Dismiss, Ex. 20 (Docket #6); *Midwest Indep. Transmission Sys. Operator, Inc.*, 108 FERC ¶ 61,236 (Sept. 16, 2004) ("*GFA Order*"), Mot. to Dismiss, Ex. 21 (Docket #25); *Midwest Indep. Transmission Sys. Operator, Inc.*, 111 FERC ¶ 61,042 (April 15, 2005) ("*GFA Rehearing Order*"), Mot. to Dismiss, Ex. 24 (Docket #7); *Second GFA Rehearing Order*, 112 FERC ¶ 61,311, Mot. to Dismiss, Ex. 26 (Docket #7).

As a result, the Court finds that Plaintiff's contract claims to recover certain congestion and loss charges are not barred by the doctrine of field preemption.

B.    Conflict Preemption

Even were the Court to assume that Congress has not granted FERC complete preemption over Plaintiff's claims, CCG argues that the action is preempted because it directly conflicts with action taken by FERC in this area.

Conflict preemption exists "'if there is an actual conflict between federal and state law, or where compliance with both is impossible.'" *Grays Harbor*, 379 F.3d at 649-50 (quoting *Gadda v. Ashcroft*, 363 F.3d 861, 871 (9th Cir. 2004)).  *See also Pac. Gas & Elec.*, 461 U.S. at 204 ("Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law.").  Where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . . ," conflict preemption bars the state-law claim.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  In such circumstances, the state rule is preempted to the extent is actually interferes with "methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

1.    **SECA charges**

According to CCG, FERC has set rates, including SECA charges, has determined which party should pay those charges, and has created a specific means to seek a shift in responsibility under particular existing contracts.  FERC, therefore, has exercised its jurisdiction in the area and has established a particular method for aggrieved parties to

address unfairness under the contract. MSCPA has, in fact, invoked that process and obtained a result in its favor. As a consequence, any parallel state-law claim in this Court has the potential to reach a different result and be in direct conflict with the FERC determination.

The Court agrees. In its initial opinion issued August 10, 2006, the FERC ALJ expressly considered the contract and relationship between MSCPA and CCG in light of the elimination of ROTRs and imposition of SECA charges. The ALJ found that, as a matter of fairness, most of the SECA charges imposed upon MSCPA should be shifted to CCG. *See Midwest Indep. Tranmission Sys. Operator, Inc.*, 116 FERC ¶ 63,030 (Aug. 10, 2006). That determination is a rate "fixed" by FERC that this Court has no right to alter. *See Montana-Dakota*, 341 U.S. at 251-52.

MSCPA argues that the claims before FERC were not identical to those before this Court. FERC considered only federal law, not the state-law indemnification provision. Plaintiff argues that, because FERC did not rule on the state-law claim, the action is not preempted.

MSCPA's argument is neither a wholly accurate reflection of the facts nor a correct assessment of preemption law. In bringing its claim before FERC, MSCPA expressly invoked the same contract provisions it invokes in this Court. (*See*, *e.g.*, MSCPA Notice of Intent to Shift SECA Obligation to Shipper, Def. Mot. to Dismiss, Ex. 11 at pp. 2-4, Docket #5; Initial Brief of MSCPA to FERC, Def. Mot. to Dismiss, Ex. 15 at pp. 12-13, Docket #5.) Citing the contract provisions, MSCPA argued that the assignment agreement required CCG

21

to "to hold MSCPA . . . harmless 'from any and all costs (including, but not limited to costs associated with transmission, congestion management or otherwise) incurred by Constellation or Counterparty [MSCPA] in connection with Constellation's delivery of Power to the Delivery Point. . . .'" *Id.* It further argued that the contract price was to be the "total consideration to be paid by MSCPA" for delivered power under the contract, that CCG was responsible for any transmission losses and loss charges relating to the transmission of Power to the Delivery Point(s)," and that title passes from CCG to MSCPA at the delivery point. *Id.* In reaching her finding in the initial FERC decision, the ALJ relied on the fact that the cost to MSCPA was unchanged, regardless of the elimination of ROTRs. The ALJ referred to Article III, § 3.1 of the Master Agreement to find that CCG "expressly took 'responsib[ility] for any transmission losses and loss charges relating to the transmission of Power to the Delivery Point(s).'" (*Midwest Indep. Trans. Sys. Operator, Inc.*, 116 FERC ¶ 63,030, P 431(Aug. 10, 2006), Def. Reply Br. in Supp. of Mot. to Dismiss, Ex. 2, Docket #16.)

Moreover, the ALJ determined as a matter of law that CCG was the shipper for purposes of shifting the SECA charges from MSCPA to CCG for the predominant portion of the total amount of SECA charges, relying in part on the contractual language. That determination, while not yet final, represents a FERC decision on the fairness and reasonableness of which party should bear the SECA costs in issue in this case. It therefore constitutes the rate fixed by FERC. *Montana-Dakota*, 341 U.S. at 250-51. "[B]y asking the court to set a fair price, [MSCPA] is invoking a state rule (specifically, contract law) that

22

would interfere with the method by which the federal statute was designed to reach it[s] goals . . . ." *Gray's Harbor*, 379 F.3d at 650.  The heart of MSCPA's claim is a request that this Court enter a decision that would potentially hold CCG liable for a different amount than that determined by FERC.  That potential conflict is the essence of conflict preemption. *Montana-Dakota*, 341 U.S. at 250-51.  The Court therefore finds that Plaintiff's contract claim for recovery of the SECA charges is preempted by the doctrine of conflict preemption.

### 2.    congestion and loss charges

CCG has made no argument concerning how MSCPA's claim under Count II for recovery of the congestion and loss charges is preempted by the concept of conflict preemption.  Nothing about the FERC proceedings regarding the treatment of carved-out GFAs for purposes of congestion and loss charges will be disrupted by MSCPA's contract claim against CCG.  The FERC determinations in issue reflect a balancing of equities as between MISO members in their relative liability for necessary costs of administering the MISO energy market.  CCG is not such a member, but instead is a supplier under contract to MSCPA.  That contract is relevant to FERC's decisions only insofar as the determination of whether the agreement should be treated as a carved-out GFA.  Indeed, the rationale for FERC's determination to treat certain contracts as a carved-out GFAs rested on a conclusion that the contract expectations of the parties must be respected in the absence of a demonstrated public interest warranting unilateral modification of the those GFAs.  *See Midwest Indep. Transmission Sys. Operator, Inc.*, 108 FERC ¶ 61,236, PP 4, 142 (Sept. 16, 2004) ("GFA Order"), Mot. to Dismiss, Ex. 21 (Docket #25) (citing *Mobile-Sierra* test from

*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956) ("*Mobile*"); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) ("*Sierra*")).  As a result, the FERC process included and contemplated respect for the existing contracts between the parties.

Even assuming the ongoing process between MISO and MSCPA to address the impossibility of MSCPA complying with scheduling requirements eventually results in the elimination of the requirement, the result would not conflict in any way with this Court's determination as to whether CCG has violated its contractual provisions or must indemnify MSCPA for congestion and loss charges incurred.  If such charges ultimately are eliminated, CCG's liability would be eliminated as well.

In sum, Defendant has not articulated and the Court cannot find any basis for finding conflict preemption.

C.      Filed-Rate Doctrine

In its final argument, CCG argues that the Court's exercise of jurisdiction over MSCPA's claims violates the filed-rate doctrine.  First articulated in *Montana-Dakota*, 341 U.S. at 251-52, the doctrine holds that state law and certain federal laws may not be used to invalidate a filed rate or to assume a rate would be charged other than the rate charged by the federal agency in question.  *See also Ark La.Gas Co.*, 453 U.S. at 577.  Once rates have been set by FERC, any waiver of that rate must be granted by FERC.  *Id.*  "Under th[e] doctrine, no regulated seller is legally entitled to collect a rate in excess of the one filed with the Commission for a particular period."  *Ark. La. Gas Co.*, 453 U.S. at 576.

24

### 1.    SECA charges

For similar reasons to those supporting the Court's finding of field preemption of Plaintiff's claim for recovery of SECA charges, the Court also finds that the claim is barred by the filed-rate doctrine.    FERC has set the SECA rate, determined which party presumptively will bear the charge, and has established a process to shift that charge. MSCPA has invoked that process and has received an initial determination of which party should bear the charge.    FERC therefore has operated to establish the fair and reasonable charge as between these parties.    "No court may substitute its own judgment on reasonableness for the judgment of the Commission.  The authority to decide whether the rates are reasonable is vested by § 4 of the Act solely in the Commission . . . ."  *Ark. La. Gas Co.*, 453 U.S. at 577.

Moreover, "[e]ven were the Commission not on record in this case, the mere fact that respondents brought this suit under state law would not rescue it, for when congress has established an exclusive form of regulation, 'there can be no divided authority over interstate commerce.'" *Id.* at 580 (quoting *Missouri Pacific R. Co. v. Stroud*, 267 U.S. 404, 408 (1925)). As the Supreme Court in *Ark. La. Gas Co.* recognized, a finding by this Court that CCG should pay an additional portion of MSCPA's SECA charges to those ordered by FERC would "necessarily [be] supported by an assumption that the higher rate . . . was reasonable." *Id.*

MSCPA suggests that it should not be denied its contractual rights when FERC did not  expressly decide those claims.  The Supreme Court has observed that FERC ordinarily

lacks the authority "'to abrogate existing contractual arrangements'" "absent extraordinary circumstances." *Id.* at 582 (quoting *Permian Basin Area Rate Cases*, 390 U.S. 390 U.S. 747, 820 (1968)). The *Ark. La. Gas* Court held, however, that the rule did not affect the supremacy of the Act itself. *Id.* "[W]here there is a conflict between the filed rate and the contract rate, the filed rate controls." *Id.* The Court expressly recognized that the "'rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress . . . .'" *Id.* (quoting *Louisiana & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915). "Every pre-emption case involves a conflict between a claim of right under federal law and a claim of right under state law. A finding that federal law provides a shield for the challenged conduct will almost always leave the state-law violation unredressed." *Id.*

Under clear federal law, MSCPA's contractual claims for recovery of SECA charges are barred by the filed-rate doctrine.

### 2.    congestion and loss charges

Defendant again provides little discussion of its claim that Plaintiff's recovery of congestion and loss charges from CCG is barred by the filed-rate doctrine. As it did with its discussion of field preemption, CCG suggests that Plaintiff's contractual claims require the Court to determine whether congestion and loss charges are "transmission" or "delivery" based, a determination already made by FERC in determining the reasonableness of those charges. For the reasons previously discussed, the Court is unpersuaded that FERC's determination of the MISO tariff and the exemption of carved-out GFAs from congestion and

loss charges under that tariff preempts MSCPA's attempted enforcement of the physical delivery requirement of the contract or the indemnification clause.  Neither claim will require this Court to determine the reasonableness of FERC rates imposed on GFAs or amount to an impermissible collateral attack on those rates.  *Miss. Power & Light Co.*, 487 U.S. at 374-75. Indeed, if the contract requires physical delivery, as claimed by MSCPA, its enforcement will effectuate the decision of FERC, which exempts carved-out GFAs from those charges when proper information is provided by the carved-out GFA.

### III.

For the foregoing reasons, Defendant's motion to dismiss will be granted in part and denied in part, as set forth in this Opinion.  Count I of the complaint will be dismissed.  The motion will be denied as to Count II.  An Order consistent with this Opinion will be entered.

Dated:    December 12, 2006             /s/ Robert Holmes Bell
                                         ROBERT HOLMES BELL
                                         CHIEF UNITED STATES DISTRICT JUDGE